UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOSEPH O'KEEFFE**, *et al.*,

    **Plaintiffs,**

v.

**CENLAR AGENCY, INC.**, a/k/a
Cenlar FSB, *et al.*,

    **Defendants.**

Case No. 2:22-cv-4070
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants Cenlar Agency, Inc. a/k/a Cenlar FSB and CitiMortgage, Inc.'s (collectively, "Cenlar") Motion to Dismiss (ECF No. 21). For the reasons stated herein, the Court **GRANTS in part** and **DENIES in part** Cenlar's Motion.

## BACKGROUND

### I. Factual Background

In early 2021, Plaintiffs Joseph and Alison O'Keeffe applied for a modification of their mortgage loan. (Am. Compl., ECF No. 8, ¶ 22.) Plaintiffs' loan modification applications and communication with Cenlar are the basis of this lawsuit. Below, the Court sets forth only the allegations relevant to the pending Motion to Dismiss.

### A. The Loan Modification Agreements

As part of the loan modification process, Cenlar approved Plaintiffs for a Trial Payment Plan. (*Id.* ¶¶ 1, 23–25.) Once Plaintiffs completed that Plan, Cenlar drafted and transmitted to Plaintiffs a loan modification agreement (the "Initial Modification Agreement"). (*Id.* ¶¶ 26–28.) Plaintiffs did not sign the Initial Modification Agreement because it misspelled Mrs. O'Keeffe's

1

name. (*Id.* ¶¶ 28–32.) Plaintiffs informed Cenlar of this error but continued to make monthly payments pursuant to the Trial Payment Plan. (*Id.* ¶¶ 32–36.) Cenlar then drafted and transmitted to Plaintiffs a revised loan modification agreement with the correct spelling of Mrs. O'Keeffe's name, which Plaintiffs signed and returned to Cenlar. (*Id.* ¶¶ 37–38.) Thereafter, Cenlar executed and recorded the revised agreement (the "Recorded Modification Agreement") with the Delaware County Recorder's Office. (*Id.* ¶¶ 43, 54.) Despite executing the Recorded Modification Agreement, Cenlar did not update the terms of the Recorded Modification Agreement in its billing system and continued to bill Plaintiffs pursuant to the previous, unmodified mortgage. (*Id.* ¶¶ 45–47, 56–58.)

Cenlar discovered that the Recorded Modification Agreement contained terms different from what it intended, so Cenlar sent a revised agreement to Plaintiffs that corrected Mrs. O'Keeffe's name and contained a modified principal balance of $213,369.76 at an interest rate of 3.625% (the "Third Modification Agreement"). (*Id.* ¶¶ 61–64.) The Recorded Modification Agreement, meanwhile, had a drastically different modified principal balance, as well as a different interest rate. The Recorded Modification Agreement had a modified principal balance of only $120,108.41 and an interest rate of 3.5%.[1] (*Id.* ¶ 29.)

Plaintiffs refused to sign the Third Modification Agreement, and Cenlar refused to honor the Recorded Modification Agreement, stating that Plaintiffs were in default on their mortgage. (*Id.* ¶¶ 64–67, 72.) Cenlar refused to accept monthly payments from Plaintiffs. (*Id.* ¶ 74.)

The issues underlying this dispute are the alleged discrepancies between the Initial,

---

[1] Plaintiffs allege that *both* the Initial and Recorded Modification Agreements contained a principal balance of $120,108.42 and an interest rate of 3.5%. (Am. Compl. at ¶ 29.) Cenlar disputes this. (Def. Mot., ECF No. 21, at PageID # 231.) Whether the Initial and Recorded Modification Agreements each had the same principal balance and interest rate is immaterial to this Order.

Recorded, and Third modification agreements.

## B. The Qualified Written Requests

Thereafter, Plaintiffs sent "Qualified Written Requests" ("QWRs") to Cenlar pursuant to the Real Estate Settlement Procedures Act ("RESPA"). (*Id.* ¶¶ 77–78.) Plaintiffs' QWR included both a Notice of Error ("NOE") and a Request for Information ("RFI"). (*Id.* ¶ 78.) Plaintiffs incurred legal fees and costs associated with preparing and mailing the QWR to Cenlar. (*Id.*)

The NOE informed Cenlar that it was in error for:

- Refusing to implement the Recorded Modification Agreement by adjusting the terms of Plaintiffs' account to reflect the modified principal balance of $120,108.41 and interest rate of 3.5%;
- Refusing to accept and properly apply Plaintiffs' payments to their loan; and
- Improperly assessing interest, fees, and charges against Plaintiffs' account.

(Am. Compl. at ¶ 79; Ex. F to Def. Mot., ECF No. 22, at PageID # 308–13.)

Plaintiffs' RFI sought a large swath of information, including:

- Call logs, recordings, service notes, and records of communications between Cenlar and Plaintiffs; and
- All documents from January 2021 to the present related to the modification or any other loss mitigation options, including agreements, offers, internal notes, emails, and communications regarding the same.

(*Id.* at ¶¶ 80–81.)

Cenlar responded to Plaintiffs' QWRs. (*Id.* at ¶¶ 82–90.) Cenlar's response letter states that it reviewed the loss mitigation file, then provides background leading to its decisions. (Ex. G to Def. Mot., ECF No. 22, at PageID # 318–19.) It states that "[a] discrepancy was identified" in the Recorded Loan Modification, clarifying that the Initial Modification Agreement had different interest rate terms. (*Id.*) Accordingly, Cenlar states it executed the Correction Agreement, which was part of the October 27, 2021, modification documents. (*Id.*) The Correction Agreement provided that, should any document in the loan modification agreement misstate or inaccurately reflect the true and correct terms of the loan, "Borrower will comply with Lender's request to

3

execute, acknowledge, initial, and/or deliver to Lender any documentation Lender deems necessary to replace and/or correct the lost, misplaced, omitted, misstated or inaccurate document(s)." (Ex. B to Def. Mot., ECF No. 22, at PageID # 274.)

Cenlar also explained that a Trial Period Plan approval letter disclosed that the interest rate would reduce from 4.00% to 3.625%, that the Initial Modification Agreement had a 3.625% interest rate, and that the Recorded Modification Agreement—sent after correcting the spelling of Mrs. O'Keeffe's name—inadvertently stated a 3.5% interest rate. (Def. Mot., ECF No. 22, at PageID # 318.) Cenlar's response did not discuss the difference in principal balance between the various loan modification documents. (*See generally id.*) Cenlar stated that the payments were returned to Plaintiffs because the funds were insufficient to reinstate their loan in full. (*Id.* at PageID # 319.) Because the loan was past due, Plaintiffs could not make payments online, or access all loan information online, and Cenlar referred the loan to foreclosure. (*Id.*) Plaintiffs allege that while Cenlar provided some documentation to accompany its response, it did not provide all requested documents or explain why such documents were unavailable. (Am. Compl. ¶¶ 83–90.)

Thereafter, Cenlar filed a foreclosure Complaint against Mr. O'Keeffe, which it dismissed within a week. (*Id.* ¶¶ 91–98.)

II. **Procedural Background**

Cenlar moved to dismiss Plaintiffs' claims for RESPA QWR violations (Count I), violations of RESPA's "120 Day" rule (Count II), and breach of contract (Count III). (Def. Mot., ECF No. 21.) Plaintiffs filed a response in opposition to the Motion. (Pl. Resp., ECF No. 24.) Cenlar then filed a reply, wherein it abandoned its Motion regarding Counts II and III. (Def. Reply,

4

ECF No. 25, at PageID # 449–50.)  Accordingly, Cenlar's Motion regarding Count I is ripe for this Court's review.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of actions that fail to state a claim upon which relief can be granted.  While Rule 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (clarifying plausibility standard articulated in *Twombly*).  Further, "[a]lthough for purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* at 678 (quoting *Twombly,* 550 U.S. at 555) (internal quotations omitted).

In addition to a complaint, the Court can consider (1) documents that are referenced in the complaint and that are central to a plaintiff's claims, (2) matters of which a court may take judicial notice (3) documents that are a matter of public record, and (4) letters that constitute decisions of a governmental agency when ruling on a motion to dismiss.  *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of

Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings . . . . [C]ourts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.").

## ANALYSIS

Count I of Plaintiffs' Amended Complaint derives from the Real Estate Settlement Procedures Act ("RESPA"). RESPA creates and governs certain obligations on the part of loan servicers. "As a remedial statute, RESPA is construed broadly to effectuate its purposes." *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013). Relevant to this Order are RESPA's mandates regarding QWRs. 12 U.S.C. § 2605(e)(1)(B). Plaintiffs' QWR consisted of (I) a Notice of Error ("NOE"); and (2) a Request for Information ("RFI").

### I.  Plaintiffs' Notice of Error

As Cenlar notes, examining whether a party properly responded to a QWR "need not be more complicated than looking at the mortgage servicer's response and seeing if it fits the express terms of Regulation X in responding [to] the errors alleged in Plaintiff's NOE." *Blair v. PNC Bank, N.A.*, No. 1:21-CV-766, 2022 WL 2986868, at *6 (S.D. Ohio July 28, 2022).

To adequately respond to an NOE, the mortgage servicer must respond to a borrower's NOE by either:

> (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or
>
> (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. §§ 1024.35(e)(1)(i)(A), (B).  Here, there is no dispute that Cenlar did not correct the alleged error.  (Def. Mot., ECF No. 21, at PageID # 235–37.)  Accordingly, at issue is whether Cenlar complied with § 1024.35(e)(1)(i)(B).

"The key requirement is that the loan servicer conduct a 'reasonable investigation,' meaning, at minimum, a 'search or inquiry . . . to test the validity of [the borrower's] complaints.'" (*Id.*) (quoting *Marais v. Chase Home Fin.*, LLC, 24 F. Supp. 3d 712, 724 (S.D. Ohio 2014)). "Merely providing documents and a statement that there are no errors is not enough." *Id*.

Plaintiffs allege that Cenlar did not conduct a reasonable investigation, inadequately explained the discrepancy between the modification agreements' interest rates and fees charged to Plaintiffs' account, and wholly ignored the different principal balances.  (Am. Compl., ECF No. 8, at ¶¶ 83–85, 108–09.)  Specifically, Plaintiffs argue that Cenlar's failure to address the $90,000 difference between the Recorded Loan Modification and Third Loan Modification demonstrates that Cenlar did not conduct a reasonable investigation or read the language of the Correction Agreement.  Plaintiffs further state that Cenlar's omission shows that Cenlar failed to provide the basis for its belief that no error occurred.[2]

Cenlar argues that "it is a fallacy to claim that Cenlar would have come to a different conclusion, and answered the QWR different [sic], had Cenlar only done a 'reasonable investigation' and fully explained every reason why the [Recorded Modification Agreement] was incorrect."  (Def. Reply, ECF No. 26, at PageID # 450.)  This argument is not well taken.

---

[2] Much of Plaintiffs' response in opposition to dismissal of its NOE claim concerns Cenlar's decision to exercise the Correction Agreement.  (*See generally* Pls. Resp., ECF No. 24, at PageID # 424–27.)  As Cenlar correctly notes, arguments regarding the validity of Cenlar's execution of the Correction Agreement pertain to Plaintiffs' breach of contract claim—not Plaintiffs' QWR claims under Count I.

While the "end result" may be the same—namely, that Cenlar does not believe that a valid and enforceable loan modification agreement exists because of allegedly incorrect terms in the Recorded Modification Agreement—Cenlar's belief itself is not what RESPA and its regulations dictate. Put differently, the mere fact that Cenlar would have concluded that no enforceable loan modification existed after conducting a reasonable investigation does not absolve them of the responsibility of conducting a reasonable investigation and explaining their belief as to why the Recorded Modification Agreement was incorrect.

By arguing that the "end result" *would* be the exact same if it had conducted a reasonable investigation, Cenlar's Reply appears to concede that it did not conduct a reasonable investigation. At a minimum, Cenlar's Response to Plaintiffs' NOE did not address the difference in principal balance between the Initial and Recorded Modification Agreements. Plaintiffs state a plausible claim that Cenlar's Response to Plaintiffs' NOE did not meet the requirements of RESPA. Therefore, dismissal is unwarranted at this stage.

For these reasons, Cenlar's Motion regarding the NOE portion of Count I is **DENIED**.

## II.     Plaintiffs' Request for Information

To properly respond to an RFI, a servicer must respond to the borrower by either:

(i)     Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or

(ii)    Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance.

12 C.F.R. §§ 1024.36(d)(1)(i), (ii).

Plaintiffs allege that Cenlar failed to properly respond to their RFIs by failing to produce documents in its possession relating to the loan modification process, and that Cenlar avoided the

8

specific request for call logs and internal notes. (Am. Compl. at ¶¶ 86–90.) In its Reply, Cenlar merely focuses on the alleged damages suffered by Plaintiffs. Cenlar does not respond to Plaintiffs' arguments regarding several records allegedly missing from Cenlar's production, or the fact its response did not indicate that such records were unavailable.[3] (*Compare* Pl. Resp., ECF No. 24, at PageID # 423–24, *with* Def. Reply, ECF No. 25, at PageID # 451–52.) Accordingly, the Court considers only whether Plaintiffs suffered legally cognizable damages, and whether those damages satisfy Article III standing requirements such that Plaintiffs may assert Count I regarding the RFI.[4]

### A. Whether Plaintiffs Suffered Legally Cognizable Damages

Where a servicer fails to comply with RESPA, it shall be liable to the borrower for actual damages incurred and any additional damages for a pattern or practice of noncompliance. 12 U.S.C. § 2605(f). "Recovery under RESPA requires more than establishing a violation . . . ," and a plaintiff "must suffer actual, demonstrable damages" as a result of the specific RESPA violation. *Jester v. CitiMortgage*, No. 1:13 CV 1926, 2014 WL 5091712, at *4 (N.D. Ohio Oct. 9, 2014). "Actual damages" is not defined within RESPA, but this Court has previously found that costs incurred as a result of preparing a QWR constitute actual damages. *Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 728 (S.D. Ohio 2014) ("[A]ll expenses, costs, fees, and injuries fairly

---

[3] Cenlar argues that Plaintiffs' RFI was a form document addition to the QWR, and that it was not written to fit the facts of this dispute. Cenlar further states that it was a "laundry list of overbroad and irrelevant documents for which Cenlar had no duty to respond under 12 C.F.R. § 1024.36(f)." (Def. Reply, ECF No. 25, at PageID # 451.) While 12 C.F.R. § 1024.36(f)(1) does obviate a servicer's duty to produce requested documents where it reasonably determines that the request is overbroad or seeks irrelevant information, § 1024.36(f)(2) requires that the servicer gives notice to the borrower of its determination. 12 C.F.R. § 1024.36(f)(2). Cenlar did not give such notice here. (*See* Ex. G to Def. Mot., ECF No. 22, at PageID # 318–19.)

[4] While Cenlar's Motion to Dismiss analyzed the damages associated with the QWR without distinguishing the RFI from the NOE, its Reply only raises standing arguments regarding the RFI. (*See generally* Def. Reply, ECF No. 25.)

9

attributable to Chase's failure to respond appropriately to the QWR, even if incurred before the failure to respond, are included.").

Cenlar argues that Plaintiffs' alleged damages are not legally cognizable. Cenlar argues that Plaintiffs' damages are based on "two non-RESPA sources." (Def. Mot., ECF No. 21, at PageID # 238.) Those two sources are (1) the damages for preparing and mailing the QWR, which Cenlar characterizes as a contractual disagreement over the enforceability of the Recorded Modification Agreement; and (2) damages for "defending against the fraudulent foreclosure." (*Id.* at PageID # 238–39.) Damages relating to the foreclosure action are unrelated to Count I. *See Schoen v. Bank of Am., N.A.*, No. 2:17-CV-648, 2019 WL 590882, at \*5, 10 (S.D. Ohio Feb. 13, 2019) ("But these fees are not relevant to liability under § 1024.41(b)(2)(i)(B) because, in Plaintiff's own words, they were 'a result of [Defendant's] refusal to honor the Modification,' not its delay in acknowledging her application.") Cenlar states that "nothing in the Amended Complaint even hints at any allegation that the Plaintiffs suffered any damages from the [RFI] portion of the QWR." (Def. Reply, ECF No. 25, at PageID # 452.) Not so. Plaintiffs allege that they incurred legal fees and costs associated with preparing and mailing the QWR. (Am. Compl., ¶¶ 81, 116.) The QWR included an RFI section. Accordingly, Plaintiffs' damages are legally cognizable.

### B. Whether Plaintiffs' Damages Create Article III Standing

Plaintiffs' damages, although legally cognizable, must satisfy the requirements of Article III to give them standing. "If a plaintiff lacks standing, then the federal court lacks jurisdiction." *Turman v. Select Portfolio Servicing, Inc.*, No. 2:23-CV-903, 2023 WL 7003365, at \*1 (S.D. Ohio Oct. 24, 2023) (Watson, J.) (citing *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950–51 (2019)). To have standing, plaintiffs must demonstrate that (1) they suffered a concrete,

10

particularized, and actual or imminent injury in fact; (2) that the defendant(s) likely caused the injury; and (3) that the injury would likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The Supreme Court has clarified that "Article III standing requires a concrete injury even in the context of a statutory violation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), as revised (May 24, 2016)). "For standing purposes, 'causation' means a 'causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant[.]'" *Turman*, 2023 WL 7003365, at *1–2 (quoting *Lujan*, 504 U.S. at 560). Cenlar argues that Plaintiffs' QWR claim regarding the RFI lacks concrete injury, and therefore must be dismissed for lack of standing. (Def. Mot., ECF No. 21, at PageID # 238; Def. Reply, ECF No. 25, at PageID # 452.) The Court agrees that Plaintiffs lack standing to pursue Count I as it relates to their RFI damages.

In recent years, the Sixth Circuit has clarified the level of concreteness required for a statutory violation to confer Article III standing. *Ward v. Nat'l Patient Acct. Servs. Sols., Inc.*, 9 F.4th 357, 361 (6th Cir. 2021) (citing *Spokeo*, 578 U.S. at 340–41 and *TransUnion*, 594 U.S. at 428–30). In *Ward*, the Sixth Circuit held that incurring costs for retaining counsel to pursue a claim does not constitute concrete injury for Article III standing. *Id.* at 363; *see also Board v. Union Sav. Bank*, No. 1:21-CV-149, 2022 WL 1211418, at *3-6 (S.D. Ohio Apr. 25, 2022) (Black, J.) (applying *Ward* and finding that costs and attorneys' fees incurred to pay counsel to draft and transmit QWRs do not constitute concrete injury creating Article III standing). However, costs incurred for defending against a separate proceeding—such as a foreclosure action—*are* concrete and particularized without raising the concern that plaintiff may manufacture standing by filing a new lawsuit. *Hurst v. Caliber Home Loans, Inc.*, 44 F.4th 418, 423 (6th Cir. 2022) ("Here, the

11

costs in the foreclosure suit are separate and distinct from litigation costs in the RESPA litigation, and thus not a byproduct of it."). Thus, there is a key distinction between where the cost of counsel is and is not a concrete injury: the cost of retaining counsel to enforce a statute's procedural requirements does not constitute concrete injury for Article III standing; the cost of retaining counsel to defend against a separate proceeding stemming from the statute's procedural violation does. *Compare Ward*, 9 F.4th at 363, *with Hurst*, 44 F.4th at 423.

Here, Plaintiffs briefly mention damages other than costs and attorney fees, such as "improperly applied payments and arrearages on the loan," and damages incurred for defending against the foreclosure action. (Am. Compl. ¶¶ 90–97; Pl. Resp., ECF No. 24, at PageID # 427–28.) Such damages that "flow from statutory violations" could be concrete injuries that create Article III standing. *Ward*, 9 F. 4th at 363 (quoting *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 862 (6th Cir. 2020)); *Hurst*, 44 F.4th at 423. These alleged damages, however, pertain to Plaintiffs' damages arising from the NOE, however, not the RFI. Plaintiffs' sole damages arising from Cenlar's allegedly inadequate RFI response appear to be the costs incurred in preparing and transmitting the QWR—costs which this Court has found insufficiently concrete to satisfy Article III standing requirements. *Board*, 2022 WL 1211418, at *5 (citing *Wade*, 9 F.4th at 363).

Whether this Court construes Count I's deficiencies as a failure to allege concrete injuries arising from Cenlar's RFI response—as in *Board*—or as a lack of causation between the concrete injury of defending foreclosure and the deficient RFI response—as in *Turman*—the result is the same: Plaintiffs' Count I regarding Cenlar's RFI response does not satisfy the requirements of Article III. *Compare Board*, 2022 WL 1211418, at *5–6 (dismissing a plaintiff's RESPA claim for lack of standing where the plaintiff's alleged injury of retaining counsel was not sufficiently concrete), *with Turman*, 2023 WL 7003365, at *1–2 (dismissing a plaintiff's RESPA claim for

12

lack of standing where the plaintiff's alleged injury of potential foreclosure was not caused by the defendant's deficient response to a RESPA Request).

Accordingly, the Court hereby **GRANTS** Cenlar's Motion to Dismiss Count I regarding Plaintiffs' RFI due to lack of Article III standing.

## CONCLUSION

For the reasons stated herein, the Court **GRANTS in part** and **DENIES in part** Cenlar's Motion to Dismiss (ECF Nos. 21, 22.)  Count I is dismissed without prejudice regarding Plaintiffs' RFI.  Count I survives, however, regarding Plaintiffs' NOE.

This case remains open.

**IT IS SO ORDERED.**


**3/25/2024**                                              **s/Edmund A. Sargus, Jr.**
**DATE**                                                    **EDMUND A. SARGUS, JR.**
                                                            **UNITED STATES DISTRICT JUDGE**